L422AntC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x

ANTHEM, INC.,

                    Plaintiff,

                                              New York, N.Y.

              v.                              16 Civ. 2048(ER)

EXPRESS SCRIPTS, INC.,

                    Defendant.

------------------------------------x        Remote Conference

                                             April 2, 2021
                                             3:15 p.m.

Before:

                        HON. EDGARDO RAMOS,

                                             District Judge


                             APPEARANCES

WHITE & CASE, LLP
        Attorneys for Plaintiff
BY:  GLENN KURTZ
     CLAUDINE COLUMBRES
     COLIN WEST
     JOSHUA BERMAN


QUINN EMANUEL URQUHART & SULLIVAN, LLP (DC)
        Attorneys for Defendant
BY:  KEITH H. FORST
     ELLISON S. WARD MERKEL
     CAROLYN HART

L422AntC

| | |
|---|---|
| 1 | (Case called) |
| 2 | THE DEPUTY CLERK:  Counsel, please state your name for |
| 3 | the record starting with counsel for plaintiff. |
| 4 | MR. KURTZ:  Good afternoon, Judge.  Glen Kurtz, from |
| 5 | White & Case, on behalf of Anthem, and I am joined, at least as |
| 6 | of the time that we were checking attendances a few minutes |
| 7 | ago, by Claudine Columbres and Colin West. |
| 8 | MR. BERMAN:  I'm on as well, Glenn.  It's Josh. |
| 9 | MR. KURTZ:  And Josh Berman. |
| 10 | THE COURT:  Good afternoon. |
| 11 | MR. FORST:  Good afternoon, your Honor.  This is Keith |
| 12 | Forst, with Quinn Emanuel, on behalf of Express Scripts.  With |
| 13 | me I have two colleagues, Carolyn Hart and Ellison Merkel, as |
| 14 | well. |
| 15 | THE COURT:  Good afternoon to you all. |
| 16 | This matter is on for premotion conference. |
| 17 | Before we get going, I note for the record that it is |
| 18 | being held by telephone as a result of the pandemic. |
| 19 | We are being assisted by a court reporter, so when you |
| 20 | speak, I ask that you state your name and speak slowly and |
| 21 | clearly. |
| 22 | Now, as I understand it, the reason for this |
| 23 | afternoon's conference is Express Script's objection to certain |
| 24 | amended -- or five amended reports by Anthem's experts in which |
| 25 | they purportedly fixed some mistakes that were brought to their |

L422AntC

1    attention by Express Scripts' experts.  So I think I have that

2    right but if I don't, Mr. Forst, tell me if I have gotten it

3    wrong and tell me what your position is.

4         MR. FORST:  Sure.  You have that right, your Honor.

5    Our position I think is laid out in our papers, and you are

6    exactly right.

7         Recently, late February, mid March, we received five

8    amended reports from four of Anthem's experts.  Two of those

9    reports come from one of their pricing experts, I would say

10   probably their principal pricing expert, Mr. Dave Borden.  And

11   to be clear there, one of those reports is a third amended

12   opening report and then a revised rebuttal report from

13   Mr. Borden, then there are three other amended reports on the

14   operational side of the case.  Those come from three different

15   experts and I would say, again, there, one, their principal

16   expert, Ms. Andrea Foulkes.  So our objection is just that,

17   your Honor.

18        We were before you in December dealing with this

19   issue, where Anthem sought to file additional reports.  We had

20   our scheduling order, two rounds of reports, and it is ten

21   months now, in the middle of depositions, and we received these

22   reports.  And we think, when you look at it, this is not a

23   situation, under Rule 26, where these are mere corrections.

24   These are big changes, and changes that come directly from our

25   experts, where we were criticizing the approaches and the

L422AntC

1    methodology and the way in which they did their analysis.

2           For example, Mr. Bordon's report, it's a pricing one,

3    it's a big report, your Honor, with a lot of spreadsheets, and

4    we have examples where he has gone in and fundamentally changed

5    his analysis, where we have -- you know, there are -- we

6    received 16 Excel spreadsheets that are revised and, to put it

7    in perspective, one of those has over 50,000 changes to the

8    cells within that, were going through and making corrections

9    and changing things.

10          And the same is true on the op side, where Anthem has

11   come in, after we criticized various approaches, and they have

12   gone and they have changed their methodology.  And our

13   position, your Honor, is just that they can't do that.  That's

14   not proper under Rule 26.  Rule 26 -- we wouldn't be objecting

15   if this was cells where, instead of two plus two equals four,

16   it's two plus two equals five.  Those kinds of corrections

17   happen in cases like this.  But we are at the stage here where

18   they don't get the chance, we don't think, properly, under the

19   rule, to come in, when it is the same information, it is the

20   same documents, it is the same analysis, and just come in and

21   get a re-do and basically say, we made these mistakes and we

22   want to fix them and we want to fix them in ways that basically

23   scrubs those errors, scrubs those problems, and inoculates

24   these reports from criticism.  Those should be stricken and

25   they should not be allowed, again, to get a reset, and we

L422AntC

1   should be able to use those, of course, to cross them and to

2   deal with it.

3          And it puts us in a spot.  I have to be honest, too,

4   your Honor, we are still working through these things.  Right?

5   Our experts are now in a position where we are taking a look at

6   their analyses, trying to figure out what they did, how they

7   did it.  We are having to go back and look at our own analyses

8   and say, okay, what do we need to change, when do we need --

9   you know, how do we need to address these new changes.

10          And Anthem's position really is, I think, reading

11   their letter, if I understand it, is they can do this up until

12   30 days before trial.  Even if damages go up, if they go down,

13   they have the opportunity over and over again to supplement if

14   they look at something and they made a mistake, and then there

15   is just no end in sight to that.

16          And we don't think -- we think the law is crystal

17   clear in SDNY, I mean, there are cases on point from this

18   jurisdiction that basically say unless it is information that

19   was previously unknown to you, that you didn't have, then

20   that's when you are allowed to do a proper supplement.  But

21   what you are not allowed to do is to do -- after five years of

22   a case, work up your expert analyses, come up with damages

23   numbers, come up with statistical methods, then receive

24   rebuttal reports that fault those in their approach and how

25   they were thinking about things and extrapolating damages and

L422AntC

1    basically say, You are right.  Here.  Let me fix it.  Let me

2    change it.  Let me tweak my methodology and present a new

3    analysis.

4            We are in a spot where, your Honor, we are jammed up.

5    The expert reports came, again, a week before we were slated to

6    take an operational expert's deposition.  We have these new

7    reports now.  We have depositions next week, and the prejudice

8    is profound.

9            When we are in a time, your Honor, where we are

10   preparing our experts, we are thinking about taking depositions

11   based on the prior analyses, we now have new analyses that come

12   in, and we are having to break that down and look at it and

13   evaluate it.

14           And, again, we thought, going into this, we all agreed

15   it was two rounds of expert reports, everybody had ample

16   opportunity, and yet we just got these.  And the timing, I also

17   think, your Honor, basically is proof positive that these

18   aren't mere calculation fixes.  If they were, it's hard to

19   understand why it took four months to get it done.  Right?

20   They got our rebuttal reports months and months and months ago,

21   and then we had the hearing in front of you three months ago,

22   and yet, still, three months later, we get these new reports

23   out of the blue, and it's five of them.

24           So what we think, again, is they should be stricken.

25   The supplemental reports can't be the basis for which they are

L422AntC

1  new opinions, they can testify, and scrub them anew, and they

2  should -- they can 'fess up to them, we get to cross them on

3  that, and we just have to hit pause, freeze frame, and go on

4  with these depositions based on their original opinions, and

5  that, I think, is where we stand.

6        We have had -- I want to flag, your Honor --

7  conversations with the other side about the schedule now,

8  because we need to think through extending it a little bit so

9  we can handle depositions.  I think we are in -- I know my

10  colleague had those conversations.  We are in some tentative

11  agreement to get that done, but what we need is the ruling now

12  to say no more -- no more reports, no more fixes, no more

13  changes to your methodology.  We need to get on with this case.

14  We can't be in a position where even, let's say, summary

15  judgment or after that we are getting new expert reports.

16        So that's really where we stand on this.  If you have

17  any specific questions for me, I'm glad to answer them, but

18  that's what we are asking, that you strike these reports.

19        THE COURT:  Yes, I do have a couple of questions,

20  Mr. Forst.

21        First of all, the changes that were made, as I

22  understand it, they provided reports; you said, no, you made

23  certain mistakes; they said, you are right, we made these

24  mistakes, so let's change the reports, and the ultimate

25  conclusions inured to the benefit of ESI, correct?

L422AntC

1          MR. FORST:  That's generally right, yes, your Honor.

2          THE COURT:  And also you indicated that they were

3     looking to essentially scrub their reports and prevent you

4     from cross-examining them, but you would be able to

5     cross-examine them based on their original reports in any

6     event, correct?

7          MR. FORST:  We would be able to cross them on this,

8     that is correct, too, your Honor.  But again, where we come

9     down on this, and I don't think it's under the Rule 26, I mean,

10    these are, to some degree, if we take the operational, just to

11    give you one example, your Honor, I have talked about this

12    before, it was an audit, right, it was a sampling exercise,

13    where then they sample a set and extrapolate against a larger

14    population of what's called prior authorization claims, the way

15    they approached that, their statistician, we believe, is

16    fundamentally improper in numerous ways.  There are a whole

17    bunch of problems.

18          But one way is, so, Ms. Foulkes, if there are cases

19    where, let's say, Anthem said ESI got it wrong but there was no

20    damages, she basically cut that out of her sample set for

21    purpose of extrapolation.  And we said, well, if you do that,

22    that methodology is all wrong.  So she has gone back now and

23    tweaked it in a way in which she has changed her methodology to

24    try to address this problem.

25          Now we still have other problems.  But, again, if we

L422AntC

| | |
|---|---|
| 1 | are in a spot where every time -- if something happens at |
| 2 | deposition, your Honor, and they say, oh, that's a screw-up, |
| 3 | it's a flaw in our methodology, then, again, under Anthem's |
| 4 | interpretation of the rule, it's just continually issuing new |
| 5 | reports that tries to get it right. I mean, this isn't a |
| 6 | collaborative process, whereon the defendant, we are obligated |
| 7 | to help them figure out how to do their analyses. And that -- |
| 8 | we are just in a spot where that is happening, and these |
| 9 | aren't, again, mere calculation changes. |
| 10 | And I will also say, your Honor, if you take Borden, |
| 11 | for example, again, under Anthem's interpretation, it |
| 12 | doesn't -- I mean, damages could go up. Right? They are in |
| 13 | the position where we can keep changing this. There is nothing |
| 14 | that says that they are not going to come forward with another |
| 15 | report where damages get higher. This one happened to be |
| 16 | lower. But it's important to me that, and I think it is |
| 17 | proper, you have your expert report, and then they need to |
| 18 | stand up there and say, We got it wrong. These aren't the |
| 19 | right calculations, and we did it incorrect. |
| 20 | And it can't be also, your Honor, when we work up |
| 21 | towards *Daubert*, that they get to issue four, five, six, seven, |
| 22 | eight corrected reports all with the hopes of then saying, no, |
| 23 | we can't be *Daubert*'ed. There aren't problems, because |
| 24 | everything we screwed up along the way we have now fixed. |
| 25 | That, to me, is the purpose of our scheduling order, the |

L422AntC

1    purpose of this exercise.  It's just we are in a spot where it

2    has to be -- we had expert reports.  We had an agreement, and

3    it needs to be stopped.  There just can't be anymore, in our

4    view.

5              So you are right, but, yeah, that's my answer to that

6    question.

7              THE COURT:  Okay.  Thank you.

8              Mr. Kurtz, did I see your name on another case

9    assigned to me?  Have I become your personal district judge?

10             MR. KURTZ:  Well, I was fortunate enough to draw you

11   in another case and to get a very well-reasoned decision out of

12   you, so you did see my name, your Honor.

13             THE COURT:  But I think I have you on three cases now,

14   which is unusual for a large firm, but in any event --

15             MR. KURTZ:  My good fortune.

16             THE COURT:  So let me ask you this, Mr. Kurtz, what

17   happened here?

18             MR. KURTZ:  Well, the -- not terribly unusual, but I

19   will sort of maybe focus on Mr. Borden, who is addressing on

20   the pricing side, and he dealt with I think it was 7 million

21   data inputs, and less than one percent of those data inputs

22   literally got transferred incorrectly from source to

23   spreadsheets, and therefore the spreadsheet ran a different

24   number.

25             Mr. Forst said it's not the equivalent of saying we

L422AntC

1  had two plus two and we said it was equal to five, but it

2  really is that equivalent.  It is the equivalent of saying that

3  it should have been two plus two equals four, but somebody

4  input in the millions of cells a three instead of a two, and so

5  it became two plus three equals five, when if you go back to

6  the source document, it should have been two plus two equals

7  four.

8        It is fairly typical.  It is really what 26(e) is

9  about.  The rule says that you may supplement at any time where

10  a party learns that in some material respects the disclosure or

11  response in its expert report is incomplete or incorrect and if

12  the additional or corrected information has not otherwise been

13  made known to the other parties during the discovery process or

14  in writing.  So these guys not only had an ability to amend,

15  they actually had an obligation to do it.

16        We cited, in addition to that unambiguous rule, a

17  volume of cases and they are uniform in affirming the right to

18  correct mistakes.  We cited a volume of cases where experts

19  made exactly these types of corrections.  In contrast, ESI

20  hasn't cited a single case to support its position that an

21  expert cannot correct mistakes discovered following the

22  issuance of a report.  They haven't cited a single case where

23  an expert was not allowed to correct a calculation.  And in

24  fact the cases really go exactly the other way.  ESI, at least

25  in its letter -- we haven't spoken about it with your Honor

L422AntC

1    today, but in the letter, they actually specifically called out

2    Judge Rakoff's decision in the *SIMO Holdings* case and described

3    it with some detail, and that's actually a case where

4    Judge Rakoff denied exclusion as a "drastic and disfavored

5    measure."

6            And in that case, like every other case that ESI

7    relies on, there was actually a new test or complete change in

8    methodology, and the Court -- ESI has cited those cases --

9    actually differentiates where there was a calculation change.

10   And I think now I am hearing, after reviewing some of that, new

11   arguments that were not in the letter request that are

12   characterizing calculation errors which had been characterized

13   by their own experts as technical calculation errors and

14   changes.  They are now claiming it is some, quote, fundamental

15   analysis change or methodological change.  That's not in their

16   letter, it is not right, and we submitted the red lines of all

17   of our expert reports, and your Honor can see, then, it is just

18   changes to numbers in spreadsheets.  There is no methodological

19   change.  There is changes in data.

20           And there is an interesting aspect of this in which

21   ESI is asking for effectively asymmetrical relief where they

22   say, you know, they do benefit from the lower number and they

23   want the lower number, so they want to be able to use it, but

24   they don't want Anthem to be able to use it.  And it's not

25   clear to me how they would go about that, but they are

L422AntC

|  |  |
|---|---|
| 1 | claiming -- they claimed in the letter, but they conceded that |
| 2 | wasn't right today, is that they claimed they couldn't |
| 3 | cross-examine the expert, and that somehow Anthem was trying to |
| 4 | prevent cross-examination, which is not correct.  Anthem never |
| 5 | tried to clawback the report or took any position that it can't |
| 6 | be used.  Of course it can be used.  It's a part of the record |
| 7 | now, which really means, I think -- and I think if you look in |
| 8 | the letter you can get some quotes -- ESI really wants to be |
| 9 | able to make the first assertion that there was an error.  They |
| 10 | say, "to be clear" -- on page 5 of their letter, "To be clear, |
| 11 | ESI will not deny Anthem's experts the opportunity to admit |
| 12 | their errors and their impact at deposition and trial, during |
| 13 | which ESI will cross-examine Anthem's experts on their |
| 14 | extensive mistakes."  And ESI ask doesn't cite, and can't cite, |
| 15 | any authority or practice that would somehow allow them to |
| 16 | prevent an expert from speaking truthfully on direct in saying |
| 17 | what his calculations were so that those calculations, those |
| 18 | changes can come up for the first time as an admission during |
| 19 | cross-examination.  That's just not the way it works.  It is |
| 20 | really no different than when any witness takes the stand and |
| 21 | is asked questions in direct that will otherwise be covered in |
| 22 | cross, and it's the person who goes first gets to ask the |
| 23 | relevant question, whether it helps the case or hurts the case. |
| 24 | But these reports are not, of course, evidence.  They |
| 25 | are not admissible.  I'm sure they will be exhibits that are |

L422AntC

1    created by both parties to help illustrate what the experts are

2    saying.  But absent a stipulation, these reports are notice

3    documents, and we had an obligation to give them notice that

4    Anthem's experts agree with certain components of the rebuttal

5    so that they have that.

6         And they are served timely.  I mean, ESI's cases,

7    which, again, are all -- all confirm this is an extreme,

8    disfavored sanction, all of those cases are dealing with

9    untimely expert reports, meaning that the reports were not

10   submitted in accordance with the schedule, they are not dealing

11   with supplements, the timely expert reports, which is the issue

12   here.  As to the timing there, it is up to 30 days before

13   trial.  It has to be timely.

14        These are -- these were produced about a month ago, or

15   I guess, at this point, maybe two and a half weeks ago, and

16   Mr. Forst mentioned to you the agreement that was reached on

17   extension.  He didn't say what that was.  That's a two-month

18   agreement, which means we are going now, as I understand it,

19   through June 15 on experts.  So there has certainly been

20   ample -- there is ample opportunity for them to explore

21   whatever they want to explore, and they certainly aren't

22   prejudiced by having our experts agree with their experts, and

23   they are not prejudiced when our damage number decreased.  That

24   benefited them.  But the Courts are pretty uniform in saying

25   prejudice can be addressed by allowing another deposition.

L422AntC

Well, we don't have to allow another deposition because there

has been no deposition yet, and there is about three months,

from the time these were issued to the time that we have agreed

expert disclosure ends, for them to address it.

THE COURT:  Are they correct that it took

approximately four months, if not a little more, before these

mistakes were brought to the attention of your experts that

they produced these supplemental reports or these additional

reports?

MR. KURTZ:  I think that's right.  I think they went

in in -- maybe one in February and one in March, so I think

that's in the three- to four-month range where they had gotten

through, again, I guess seven million data entries in the

Borden report, corrected all of them, and then the number drops

out of the bottom.

Now, Mr. Forst said that that is producing work.  It's

actually not producing work, because this derives -- this work

derives from ESI's own experts.  So they worked on this

already, and it is sort of hard to understand why there is more

work to be done to understand that there is an agreement on how

to do this.

In any case, Rule 26(e) is designed exactly for this,

the point is that, from a legal standpoint, you don't preclude

an expert from getting on the stand and saying, you know, here

is my accurate number.  They don't lock in to a number that

L422AntC

1   they subsequently determined had some data entry errors, and it

2   doesn't work that, sure, it's going to come out, but it's going

3   to come out in cross instead of direct.  Witnesses can't get on

4   the stand under oath and testify to a calculation without the

5   correction that they believe needs to be made, waiting to

6   finally come clean during the course of cross-examination.

7          So they are not prejudiced in any way by the number,

8   by the fact that there is an agreement, and they do have every

9   opportunity -- and I am confident they will take every

10  opportunity -- to point out that there were some mistakes.  But

11  they are pure calculations, and maybe this core issue about

12  just being calculations and therefore within every case that we

13  could find that addressed it and not within Mr. Forst's cases

14  that addressed things like putting in a reply after a Court had

15  already issued a ruling that the defendant wasn't allowed to

16  issue a reply, running brand new caps with new science.  It's

17  not like that.

18         And we submitted, and ESI didn't, but we submitted the

19  red lines, and your Honor will be able to see that it's just

20  number calculations.  It is classic 26(e).  And we not only had

21  a right to, but we really had an obligation, because it's a

22  notice document.  And in fairness to ESI, they were entitled to

23  know in preparation for the deposition where there was

24  agreement and where there wasn't agreement.  So we aren't sure

25  it's done anything but benefit them.

L422AntC

1          I am happy to answer any questions your Honor has, but

2    I think that is the upshot of it.

3          THE COURT:  Okay.

4          Mr. Forst, I will give you opportunity to respond

5    briefly.

6          MR. FORST:  Sure.  I will be very brief, your Honor.

7          The one thing I will say is, again, the extent of

8    these changes are vast.  It is not simple data entry.  And I

9    know you can appreciate this case is really complex.  The

10   pricing, everything that goes into setting these pricing in

11   these contracts takes a ton of assumptions.  A lot of things

12   the experts think about differently.

13          And so, for example, if we are focusing on Borden,

14   there are things where he was making -- applying retail

15   nonspecialty pricing to retail specialty pricing terms, and

16   then going through and changing that in this revision and doing

17   things that are fundamental in the way that these parties, even

18   when you are in negotiations and you are thinking through on

19   how do we come up with these analyses, what are the right

20   answers.  So there are these Excel formulas.  I know you can

21   appreciate what goes behind that is a lot of assumption, a lot

22   of things, a lot of ways that these experts think about how

23   they are going to derive these numbers and apply them, and

24   that's what's changing.  Again, it's not simple -- again, and

25   the changes are vast.

L422AntC

1          What Mr. Kurtz doesn't talk about at all is on the op

2    side, right?  And, again, these are fundamental changes to the

3    methodology that they approached.  I mean, their statistician

4    came through and changed the way in which the underlying data

5    set should be thought about and how it should be extrapolated.

6    That's not a number change.  That's not a calculation change.

7    That's a fundamental difference in the way that she approached

8    it the first time, we pointed out totally incorrect for a whole

9    host of reasons, and is now trying to clean that up.

10          There are other examples, your Honor, where Anthem has

11    a continuation of care policy, which means if somebody is on a

12    drug, you might continue them on a drug even if that particular

13    prescription, under a formulaic approach, should be denied.

14    And so Anthem now has gone back and reevaluated that based on

15    our criticisms, and now we have to go back and take a look at

16    that.  What changed?  Why are they approaching this case

17    differently now?  How does that impact our analysis and

18    criticisms?  Do we have to go back and look at these cases and

19    make tweaks?

20          These things, again, on the op side and on the pricing

21    side, aren't simple changes, and the rule, again, I have said

22    it before, it's -- when something is not knowable to us, these

23    were criticisms that we pointed out, that we brought to the

24    table that infect their analyses and, again, the rule, as we

25    understand it, and I think as the courts address it, it's not

L422AntC

```
1    to clean up your mistakes.  You don't get the opportunity to

2    continue and continue revising to try to stave off *Daubert* or

3    something else.

4            Because, again, what I am hearing also is, from

5    Mr. Kurtz, under his interpretation, he can keep doing it up

6    until 30 days before trial, and then what?  Are we taking more

7    depositions?  I mean, how are we handling that?

8            I mean, this is really a first for me where, these

9    reports -- I mean, Foulkes has amended it multiple times.

10   Borden now, I think, has four amendments to his reports, and it

11   really is five months after the deadline of our rebuttal

12   reports.  And I think, again, if it was simple data

13   corrections, it just wouldn't take that long.

14           And so that's where we are.  We think they should be

15   stricken.  And, again, we think this -- we need to be clear, we

16   thought it was clear in December when this Court ruled no more,

17   and yet we got it again, and we have got to come to a place

18   where these reports have to be finished and finalized.  Anthem

19   has to come to their case and say, this is how we think about

20   damages, this is how we think about the case, this is the right

21   answer, and then either that will be correct or incorrect, and

22   this Court will hear those arguments down the road.  But we

23   just need to get to the place where there are no more

24   amendments coming our way.

25           THE COURT:  Okay.  Thank you, Mr. Forst.
```

L422AntC

1      So this is where I come down.  You know, I remember a

2   time when I tried cases where, you know, if we can get the

3   other side's expert to say you are right and I'm wrong, we

4   considered that a win and we went along our way.  But here we

5   are.

6      I think you are right, this comes down, I think, to a

7   couple of questions.  One is, are these supplemental reports?

8   And that is driven by whether or not these are simple input

9   changes or more fundamental changes to their methodology, etc.,

10  in which case they would not be supplemental reports.  I think

11  on that question it's a close one.  My understanding before

12  this phone call was that it was the position of defendants that

13  these were not wholesale changes in the -- in the way in which

14  these experts came to their inclusions but, rather, mistakes

15  that were pointed out by your experts and which they

16  acknowledged to be correct.

17     But, in any event, even if they are not supplemental

18  reports under Rule 26, I would not strike them by application

19  of the -- I hope I am pronouncing this right -- the *Outley*

20  factors.  First of all, and even assuming that the delay is

21  untoward, that aspect of the case favors preclusion, although

22  preclusion, as Mr. Kurtz has indicated, is not -- is a drastic

23  ruling in any litigation.

24     The other factors, I believe, don't favor preclusion,

25  and that is the importance of the evidence precluded.  I think

L422AntC

```
1    the parties agree that this evidence is important.  The

2    prejudice to ESI, you know, first of all, the changes that were

3    instituted inure to the favor of ESI, first of all.

4            Secondly, to the extent that ESI is concerned about

5    their ability to cross-examine Anthem's experts on these

6    various mistakes, they will absolutely be able to cross-examine

7    the experts on these various mistakes, I don't know, maybe not

8    to their heart's content, but to a reasonable extent.  So if

9    you want to walk them through their various conclusions and

10   say, And you came to this conclusion on Day A and we pointed

11   out that you were wrong, and you agreed; and then you came to

12   this conclusion on Day B, and we pointed out that you were

13   wrong and you agreed; and you came to this conclusion on Day C,

14   and we pointed out that you were wrong and you agree, that's

15   the kind of evidence that I would think a party would want in

16   front of a jury.

17           And finally the fourth factor, the possibility of a

18   continuance, I think there is still some flexibility in this

19   case.  Apparently the parties have already talked about some

20   modest extension of the discovery schedule.  I certainly would

21   be amenable to anything that the parties agree upon in that

22   regard.

23           And so, on the whole, I think the application of the

24   Outley factors does not require me to strike or preclude the

25   amended reports, so I will not do so.
```

L422AntC

1           However, I don't see why there would be any need for

2   any additional reports, and I will require the parties to

3   request permission prior to the filing of any additional expert

4   reports.

5           And with that, is there anything else that we can do

6   today?  Do you want to put your amended schedule on the record

7   now if there is agreement?

8           MR. FORST:  Your Honor, there is agreement, and I

9   think Mr. Kurtz is right it is 60 days.  I don't have the date

10  in front of me.  I'm not -- and I'm not sure if others on this

11  phone call do, so it's not clear to me what that date is.

12          MR. KURTZ:  Keith, Keith, it is Glenn Kurtz.  I

13  believe it is June 15.

14          THE COURT:  Okay.

15          MR. FORST:  Okay.  I think June 15 works for us.

16          THE COURT:  Okay.  So let's get it done by then.

17          Mr. Kurtz, anything else that we can do today?

18          MR. KURTZ:  Nothing else.  Thank you very much, your

19  Honor.

20          THE COURT:  I would ask the parties to just submit

21  whatever the amended dates are.  I don't know if there is

22  any -- any date internal to the outside date of June 15, but

23  let me know if there is.  Okay?

24          MR. KURTZ:  We will do that.  Thank you, Judge.

25          MR. FORST:  Understood.

L422AntC

1            THE COURT:  Very well.  We are adjourned.  Everyone

2     please stay well.

3            MR. FORST:  You, too, Judge.

4            MR. KURTZ:  Thank you, your Honor.

5                                oOo

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25